| | |
|---|---|
| **COMMONWEALTH OF VIRGINIA,** *EX REL.* **MARK R. HERRING, ATTORNEY GENERAL,** ) ) ) ) | |
| **Plaintiff,** ) | |
| **v.** ) | Case No. ___7:19cv463___ |
| ) | |
| **SKYLINE METRICS, LLC** ) SERVE: Bryant Cass, Registered Agent ) 312 2nd Street SW ) Roanoke, VA 24011 ) (City of Roanoke) ) | |
| ) | **COMPLAINT** |
| **ADVENTIS, INC.** ) SERVE: Bryant Cass, Registered Agent ) 312 2nd Street SW ) Roanoke, VA 24011 ) (City of Roanoke) ) | |
| ) | |
| **AND** ) | |
| ) | |
| **BRYANT CASS, an individual,** ) SERVE: 6663 Cotton Hill Road ) Roanoke, VA 24018 ) (County of Roanoke) ) | |
| ) | |
| **Defendants.** ) | |

## SUMMARY

The Commonwealth of Virginia alleges here that Roanoke-based telemarketers have robocalled hundreds of thousands of consumers nationwide to pitch online car sale services, disregarding the National Do Not Call Registry, and deceiving consumers about the online car sale services they offer and their "money back guarantee." The Commonwealth petitions this Court to enjoin these illegal telemarketing and deceptive sales practices and to award damages,

restitution, civil penalties, expenses, and attorneys' fees.

## PARTIES

1.  The Plaintiff is the Commonwealth of Virginia, by, through, and at the relation of Mark R. Herring, Attorney General of Virginia.

2.  Defendant Skyline Metrics, LLC, is an active Virginia limited liability company. On June 21, 2017, the Virginia State Corporation Commission issued its Certificate of Organization. On July 6, 2017, it registered the fictitious business name, OnceDriven. Its principal office address is 312 2nd Street, SW, Roanoke, Virginia 24011.

3.  Defendant Adventis, Inc. was, from March 26, 2002 to July 31, 2018, a Virginia stock corporation. On July 31, 2018, it terminated by operation of law for failing to renew its registration. From November 2006 to 2018, it too had a principal office address of 312 2nd Street, SW, Roanoke, Virginia 24011. Adventis, Inc. registered and did business under the fictitious names The Big Lot!, Independent Systems, Autohopper, and Open Focus.

4.  Defendant Bryant F. Cass is a resident of Roanoke, Virginia. From June 21, 2017 to the present, he served as the registered agent for Skyline Metrics, LLC, and on information and belief is also a member and manager of Skyline Metrics, LLC. From August 20, 2002 to July 31, 2018, he was the president of, a director of, and the registered agent for Adventis, Inc. At all times material to this Complaint, acting alone or in concert with others, he has formulated, managed, directed, controlled, or participated in the illegal acts and practices of Skyline Metrics, LLC and Adventis, Inc. set forth in this Complaint.

5.  The Complaint collectively will refer to Skyline Metrics, Inc., Adventis, Inc., and Bryant Cass as "Defendants."

## JURISDICTION AND VENUE

6.      Plaintiff brings this action under the following federal and Virginia laws:

a.      47 U.S.C. § 227(g)(1), which authorizes the Plaintiff to enforce the federal Telephone Consumer Protection Act and its implementing regulations, the Federal Communication Commission's Restrictions on Telemarketing, Telephone Solicitations, and Facsimile Advertising, 47 C.F.R. § 64.1200.

b.      15 U.S.C. § 6103(a), which authorizes the Plaintiff to enforce the federal Telemarketing and Consumer Fraud and Abuse Prevention Act and its implementing regulations, the Federal Trade Commission's Telemarketing Sales Rule, 16 C.F.R. §§ 310.1-310.7.

c.      Virginia Code § 59.1-203, which authorizes the Plaintiff to enforce the Virginia Consumer Protection Act.

d.      Virginia Code § 59.1-21.7:1, which authorizes the Plaintiff to enforce the Virginia Home Solicitation Sales Act through the Virginia Consumer Protection Act.

e.      Virginia Code § 59.1-517, which authorizes the Plaintiff to enforce the Virginia Telephone Privacy Protection Act.

f.      Virginia Code § 59.1-518.4, which authorizes the Plaintiff to enforce the Virginia Automatic Dialing-Announcing Devices Act through the Virginia Consumer Protection Act.

7.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) as Plaintiff alleges violations of federal statutes and regulations regulating commerce.  Further, 47 U.S.C. § 227(g)(2) provides that district courts of the United States have exclusive jurisdiction over all state civil actions brought under the Telephone Consumer Protection Act and its implementing regulation.  Likewise, 15 U.S.C. § 6103(a) provides district courts with exclusive

3

jurisdiction over state actions brought under the Telemarketing and Consumer Fraud and Abuse Prevention Act and its implementing regulations.

8.      Under 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Plaintiff's Virginia telemarketing and deceptive practices claims because they are so related to the federal telemarketing claims that they form part of the same case or controversy.

9.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (c)(1), and (c)(2) because all Defendants reside in this District.  Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims brought here occurred in Roanoke, Virginia, within this District.  Venue is also proper under 15 U.S.C. § 6103(e) and 47 U.S.C. 227(g)(4) because all Defendants inhabit and transact business in this District and the alleged violations occurred in this District.

10.      This Court has personal jurisdiction over Defendants because they are all residents of Roanoke, Virginia, transacted business in Roanoke, Virginia, and caused the injuries alleged here to consumers nationwide and Virginia residents through the telemarketing and deceptive acts and omissions they conducted in Roanoke, Virginia.

## NOTICE TO DEFENDANTS AND FEDERAL REGULATORS

11.      In accordance with Virginia Code § 59.1-203(B), before commencing this action, Plaintiff gave Defendants written notice that these proceedings were contemplated and provided Defendants a reasonable opportunity to appear before the Office of the Attorney General to demonstrate that no Virginia Consumer Protection Act violations had occurred, or, in the alternative, to execute an appropriate Assurance of Voluntary Compliance. Defendants did not show that no violations had occurred and did not execute an appropriate Assurance of Voluntary Compliance.

4

12. In accordance with 15 U.S.C. § 6103(b), before commencing this action, Plaintiff gave notice to the Federal Trade Commission.

13. In accordance with 47 U.S.C. § 227(g)(3), before commencing this action, Plaintiff gave notice to the Federal Communications Commission.

## FACTS

14. Since at least 2009, Defendants have made hundreds of thousands of telemarketing calls to consumers around the country, including Virginia residents.

15. Defendants call consumers who have placed online advertisements to sell vehicles on websites such as Craigslist, Autotrader, or Cars.com.

16. On information and belief, Defendants have used webcrawling software to harvest consumers' online posts, capturing consumers' telephone numbers and vehicle descriptions.

17. On information and belief, Defendants use the telephone numbers they have captured to initiate automated outbound telephone calls to those numbers.

18. So shortly after consumers place online vehicle advertisements, they start receiving unsolicited calls from Defendants.

19. Defendants leave pre-recorded voicemails.

20. Defendants' voicemails are purportedly from people with names such as "Peyton," "Matt," "Eric," "Allen," "Jeff," or "Brian," claiming to have clients shopping for vehicles like the one the consumer has advertised and offering to help the consumer sell theirs for a small fee.

21. Here is a transcript of one of those voicemails:

5



22.     Over the years, Defendants' pre-recorded voicemails have varied little.

23.     As in the example above, the voicemails have consistently left the same 888-941-6515 telephone number, and this number has been associated with Defendants' companies as they have changed names over time.

24.     Defendants have made these unsolicited calls under the auspices of at least two different entities, as well as a variety of fictitious names.

25.     From 2009 to 2017, Adventis, Inc. made hundreds of thousands of telemarketing calls.

26.     For instance, from September 22, 2014, to May 24, 2017, a 975-day period, Adventis, Inc. made 586,870 unsolicited telemarketing calls just to numbers with Virginia area codes, averaging 602 calls per day.

27.     Adventis, Inc. did not limit its telemarketing calls to Virginia residents; it made

6

unsolicited telemarketing calls nationwide.

28.     Over the years, when consumers responded to these calls, they reached a call center in Roanoke, Virginia, at 312 2nd Street, SW, operated by Defendants.

29.     On information and belief, from 2009 to 2017, Adventis, Inc. operated the call center under a variety of shifting fictitious business names, including Open Focus and OnceDriven.

30.     At all times relevant to this Complaint, Bryant Cass has conducted, managed, and supervised the operations of Adventis, Inc. and Skyline Metrics, LLC, including managing and supervising the call center.

31.     Among other tasks, Bryant Cass has recorded the outbound recorded telemarketing calls in which he pretended to be "Peyton," "Matt," "Eric," "Brian," or other pseudonyms, decided to whom the outbound calls would be made, hired employees, trained employees, supervised employees, set prices, written scripts for call center employees to use, and written marketing materials and website content.

32.     On information and belief, in June 2017, Bryant Cass set up Skyline Metrics, LLC to replace Adventis, Inc.

33.     In July 2017, Bryant Cass registered OnceDriven as Skyline Metrics, LLC's fictitious business name.

34.     On information and belief, sometime between 2017 and 2018, Bryant Cass had Skyline Metrics, LLC take over the assets and operations of Adventis, Inc., and the practices described here continued unabated:  thousands of outbound telemarketing calls continued to consumers around the country, the outbound telemarketing calls contained the same or substantially similar prerecorded message as alleged above, inbound calls from consumers

7

continued to go to the call center at 312 2nd Street, SW, in Roanoke, Virginia, and that call center continued to market the online vehicle sales services of the fictitious business OnceDriven.

35. As noted in the voicemail above in paragraph 21, in Defendants' initial calls to consumers trying to sell their vehicles, Defendants make several claims about car buyers and refunds: (a) they claim to have "some clients" who are shopping for vehicles; (b) from those clients, they claim to have a "list of vehicles like yours"; (c) they offer to help consumers sell their vehicle for a small fee; and (d) they "guarantee results."

36. If consumers call back, Defendants' call center employees follow a sales script to pitch vehicle sales services.

37. Defendants' sales script claims they use targeted advertising and pre-screening of buyers to help consumers sell vehicles to one of the "hundreds of prospective buyers in your area."

38. One such script directs salespeople to state the following:

We're confident we can help you get this sold quickly!

What we do is get your vehicle in front of TARGETED customers looking to purchase a vehicle like yours. We speak to buyers who let us know what they want to purchase, and we pre-screen them for you, so they know they should have financing in place before they call you.

We also have a partnership with Facebook (are you familiar with Facebook)? We pay them to TARGET SPECIFIC BUYERS for your vehicle within a 25 to 50 mile radius of where you're located, which is NOT something you can do on your own. This gets your vehicle in front of hundreds of prospective buyers in your area.

39. As the emphasis shows, the sales script directs call center employees to tout Defendants' "partnership with Facebook" and payments to Facebook to "target" specific buyers.

40. If consumers hesitate or ask certain questions, sales scripts have directed call

8

center employees to re-emphasize Defendants' ability to run targeted advertising for their customers, Defendants' connections to "buyers in your area," and that these buyers are pre-screened for financing to "make sure they are serious and have a plan for paying you."

41. Defendants' scripts have directed salespeople to state the following:

- "No one else offers a service like this. We don't wait for potential buyers to find you, we pay to promote your vehicle to buyers in your area through social media sites like Facebook and we also speak with hundreds of buyers and sellers daily, so you have a whole team of experts actively networking your vehicle."

- "We proactively market your vehicle to targeted buyers in your area. We also prescreen potential buyers and try and make sure they are serious and they have a plan for paying you. Can you see how our approach might be more effective than just putting another ad out there?"

- "As soon as you list with us, we are immediately going to begin investing time and money to sell your vehicle"

42. Defendants' scripts had false and misleading content.

43. Defendants do not pre-screen buyers for financing.

44. Defendants do not run targeted advertising or "proactively market" consumers' vehicles for all consumers who purchased Defendants' services. At Bryant Cass's direction, there have been times when Defendants completely have ceased providing targeted advertising for any customers, and other times when Defendants have provided targeted advertising for only some of their customers.

45. Defendants' sales scripts misrepresent the number of potential buyers Defendants represent, making statements like "we speak with hundreds of buyers and sellers daily" and "we literally TALK to thousands of sellers and buyers personally every week." These statements imply that Defendants will help match sellers with buyers, especially buyers "in your area."

46. In reality, Defendants are engaged primarily by vehicle sellers, not by vehicle

9

buyers.

47. Vehicle sellers purchasing Defendants' services find that Defendants generate little or no interest in sellers' vehicles and few or no connections to buyers in the seller's area. As a result, Defendants' one-sided matchmaking service is of little value to its customers.

48. Finally, Defendants' sales scripts have emphasized Defendants' money back guarantee, through statements such as, "[a]nd remember, we have a Money Back Guarantee! We are committed to getting your vehicle sold before you do. But, if you sell it on your own, you're eligible for a refund within the first 45 days."

49. If a consumer is unwilling to agree to a sale on the telephone, Defendants might email them. The email emphasizes the same points as the sales script:

- Defendants "talk to thousands of buyers every week" and our team "talks to thousands of vehicle buyers and sellers every week."
- "In addition to an online listing, our team actively sells your vehicle to the thousands of individuals we speak with every week."
- "We are so confident in our ability to get your vehicle sold that we offer a 45-Day Money-Back Guarantee. If you sell it before we do in 45 days, you can request a refund."

50. Defendants also send consumers direct mail with similar messaging: "you get a team of people who will discuss your vehicle to potential buyers when they call"; we speak to thousands of vehicle buyers and sellers every week; and "[w]e offer a 45-Day Money-Back Guarantee. If you sell your vehicle to someone Oncedriven.com did not deliver to you (within 45 days of listing with us) you may request a refund."

51. Defendants operate the website oncedriven.com.

52. Oncedriven.com also represents, "[w]e talk to thousands of buyers and sellers every week."

53. From 2018 to 2019, Defendants charged $289 for their service.

10

54.     In the past, they have charged from $89 to $189.

55.     If consumers purchase Defendants' services, they usually end up selling their car themselves.

56.     Defendants' services rarely result in sellers being successfully matched with actual buyers in their area.

57.     As a result, many if not most of Defendants' customers end up applying for refunds.

58.     Defendants make refunds hard to get.

59.     First, Defendants use procedural hurdles to reject refund requests, hurdles which contradict their advertising.

60.     As alleged above, Defendants advertise a 45-Day Money-Back guarantee, meaning that if customers sell their vehicles on their own within 45 days of purchase, they can request a refund.

61.     Once customers agree to purchase Defendants' services and pay for those services, they are provided a sales receipt.  The sales receipts and their terms are not disclosed to customers prior to purchase.

62.     On the sales receipts, Defendants add additional refund terms: to request a refund, the consumer must provide Defendants with the buyer's last name, sale date, and Vehicle Identification Number.

63.     The sales receipts also reference still more refund terms, which are only available on OnceDriven's website, stating as follows:

---

**45 Day Money Back Guarantee**
Your purchase is backed by our 45 Day Money-Back Guarantee. If you sell the vehicle in 45 days or less to a buyer who was not delivered by Once Driven, you may request a refund. The buyer's last name, sale date and vehicle VIN will be required to allow Once Driven to confirm sale of the vehicle. The full terms of the refund can be found at: http://www.oncedriven.com/guarantee/

---

11

64.     The "full terms" on OnceDriven's website both add to and contradict the advertised refund terms and the terms described on Defendants' sales receipts.

65.     For example, one additional term disclosed only on the website is that the seller must "provide a photo [of the vehicle] within 14 calendar days of sign-up" to be eligible for a refund.

66.     One contradictory term disclosed only on the website is that the refund request itself (not just the sale) must be completed and submitted to Defendants "within the first 45 days of sign-up."

67.     In practice, even if customers cleared these hurdles and qualified for refunds under all of Defendants' terms, Defendants still delayed or denied refund requests.

68.     At Bryant Cass's direction, Defendants deliberately and willfully stopped or delayed providing refunds to customers who qualified for them.

69.     For years, Mr. Cass directed his customer service managers to cap the numbers of refunds given.

70.     On a daily basis, Mr. Cass would tell the managers how many refunds they could grant, regardless of how many customers qualified for refunds. On some days, he would not allow the managers to grant any refunds.

71.     One purpose of Mr. Cass's caps was to maximize revenue. The caps' effect was to deny refunds to hundreds of customers who qualified for them.

72.     Defendants' customer service managers maintained a spreadsheet of customers who qualified for refunds. They then tracked how many times each customer requested or complained about refunds. Some customers would complain 10 or more times, to no avail.

73.     Mr. Cass's refund caps turned Defendants' customer service process Kafkaesque:

employees would repeatedly offer consumers the same excuses for why refunds cannot be made, blaming "delays" in Defendant's nonexistent accounting or refund departments; employees would keep insisting refunds were coming soon (but they often were not); employees would demand additional documents from customers, such as proofs of vehicle title transfers, but still would not grant refunds even if the customers provided those documents; sometimes they even demanded sale records that Defendants knew customers could not obtain.

74.    Ultimately, Defendants have persistently and willfully failed to honor refund requests that were properly and timely made.  So many customers ended up paying $289 just to sell their vehicles themselves.

### COUNT 1
**Unsolicited Robocalls to Cellular Phones in Violation of 47 U.S.C. § 227(b)(1) and 47 C.F.R. § 64.1200(a)(1)**
**(Against All Defendants)**

75.    Plaintiff adopts by reference paragraphs 1-74.

76.    In part, 47 U.S.C. § 227(b)(1) prohibits robocalls to cellular phones:

Prohibitions. It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States-- (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice--. . . (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States.

77.    47 C.F.R. § 64.1200(a)(1) is 47 U.S.C. § 277(b)(1)'s implementing regulation and provides in relevant part:

13

(a)No person or entity may:

(1) Except as provided in paragraph (a)(2) of this section, initiate any telephone call (other than a call made for emergency purposes or is made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice;

. . .

(iii) To any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call.

(iv) A person will not be liable for violating the prohibition in paragraph (a)(1)(iii) of this section when the call is placed to a wireless number that has been ported from wireline service and such call is a voice call; not knowingly made to a wireless number; and made within 15 days of the porting of the number from wireline to wireless service, provided the number is not already on the national do-not-call registry or caller's company-specific do-not-call list.

78. 47 U.S.C. § 227(a)(1) defines "automatic telephone dialing system" as "equipment which has the capacity-- (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *See also* 47 C.F.R. § 64.1200(f)(2) (same definition in implementing regulations.)

79. 47 U.S.C. § 227(g)(1) allows the Plaintiff to take action against "any person" engaged or engaging in a pattern or practice of "telephone calls or other transmissions to residents of that State in violation of this section or the regulations prescribed under this section."

80. Defendants have violated 47 U.S.C. § 227(b)(1) and 47 C.F.R. § 64.1200(a)(1) by initiating and making hundreds of thousands of calls using an <u>artificial or prerecorded voice</u> to telephone numbers assigned to a cellular telephone service or any service for which the called party is charged for the calls.

81. On information and belief, Defendants also have violated 47 U.S.C. § 227(b)(1) and 47 C.F.R. § 64.1200(a)(1) by initiating and making hundreds of thousands of calls using an

14

automatic telephone dialing system to telephone numbers assigned to a cellular telephone service or any service for which the called party is charged for the calls.

82. 47 C.F.R. 64.1200(f)(4) defines "emergency purposes" to mean "calls made necessary in any situation affecting the health and safety of consumers." Defendants' calls are not for emergency purposes.

83. Defendants' calls are not made solely to collect a debt owed to or guaranteed by the United States.

84. Defendants' calls are not made with the prior express consent of the called party. Instead, Defendants called consumers who had no prior contact with Defendants and had posted online advertisements with other businesses or on online platforms unrelated to Defendants, such as Craigslist, Autotrader, or Cars.com.

85. Many times Defendants called consumers whose online posting expressly discouraged telephone solicitations. For example, Defendants called consumers who had run Craigslist advertisements that stated, "do NOT contact me with unsolicited services or offers."

86. Defendant Adventis, Inc. made these calls from at least 2009 to around June 2017.

87. Defendant Skyline Metrics, LLC made these calls from around June 2017 to the present.

88. From 2009 to the present, Bryant Cass made the call recordings that were disseminated around the country and directed and oversaw the calls made by Adventis, Inc. and Skyline Metrics, LLC.

15

89.     Defendants have willfully and knowingly engaged in a pattern or practice of making telephone calls or other transmissions in violation of 47 U.S.C. § 227(b)(1) and 47 C.F.R. § 64.1200(a)(1).

90.     Defendants' ongoing and serial calls constitute a continuing violation of 47 U.S.C. § 227(b)(1) and 47 C.F.R. § 64.1200(a)(1) because each call is a related discrete act that independently violates the statute and regulation.

## COUNT 2
### Unsolicited Robocalls to Cellular Phones in Violation of Virginia Code §§ 59.1-518.2 and 59.1-200(A)(50)
### (Against All Defendants)

91.     Plaintiff adopts by reference paragraphs 1-90.

92.     Virginia Code § 59.1-518.2 also prohibits robocalls:

A caller shall not use an automatic dialing-announcing device in connection with making a commercial telephone solicitation unless: 1. The subscriber has knowingly or voluntarily requested, consented to, permitted, or authorized receipt of the message, or 2. The message is immediately preceded by a live operator who, after disclosing (i) the name of the entity sending the message, (ii) the purpose of the message, (iii) the kinds of goods or services the message is promoting, and (iv), if applicable, the fact that the message intends to solicit payment or the commitment of funds, obtains the subscriber's consent before the commercial telephone solicitation is delivered.

93.     Virginia Code § 59.1-518.1 defines a "caller" as "a person that attempts to contact, or contacts, a subscriber in the Commonwealth by using a telephone or telephone line."

94.     Virginia Code § 59.1-518.1 defines a "subscriber" as "(i) a person who has subscribed to telephone service from a telephone company or (ii) other persons living or residing with the person."

95.     Virginia Code § 59.1-518.1 defines "automatic dialing-announcing device" as

a device that (i) selects and dials telephone numbers and (ii) working alone or in conjunction with other equipment, disseminates a prerecorded or synthesized voice message to the telephone number called.

16

96.     Virginia Code § 59.1-518.1 defines "commercial telephone solicitation" as

any unsolicited call to a subscriber when (i) the person initiating the call has not
had a prior business or personal relationship with the subscriber and (ii) the
purpose of the call is to solicit the purchase or the consideration of the purchase of
goods or services by the subscriber. The term does not include calls initiated by
the Commonwealth or a political subdivision for exclusively public purposes.

97.     Virginia Code § 59.1-518.4 provides that violations of Virginia Code § 59.1-

518.2 are a prohibited practice under the Virginia Consumer Protection Act, Virginia Code §

59.1-200(A)(50), and are subject to that Act's enforcement provisions.

98.     Defendants have violated Virginia Code § 59.1-518.2 hundreds of thousands of

times by using an automatic dialing-announcing device in connection with making a commercial

telephone solicitation to numbers with Virginia area codes. Adventis, Inc. and Bryant Cass did so

from around 2009 to around June 2017 and then Skyline Metrics, LLC and Bryant Cass

continued these violations from around June 2017 to the present.

99.     Defendants are callers: they used telephones or telephone lines to contact or

attempt to contact subscribers in the Commonwealth.

100.    Defendants made commercial telephone solicitations to subscribers in the

Commonwealth: they made unsolicited calls pitching Defendants' vehicle selling services; they

did not have a prior business or personal relationship with the subscribers; and their calls'

purpose was to solicit the purchase or the consideration of the purchase of Defendants' vehicle

selling services.

101.    On information and belief, Defendants used automatic dialing-announcing

devices: they used a device that selected and dialed telephone numbers and used either that

device or other equipment working in conjunction with that device to disseminate their

prerecorded voice messages to the telephone number called.

17

102.     Defendants' prerecorded voice messages were not immediately preceded by a live operator.

103.     Subscribers Defendants called had not knowingly or voluntarily requested, consented to, permitted, or authorized receipt of the messages Defendants left or the calls Defendants made.

104.     Defendants' acts or practices in violation of Virginia Code § 59.1-518.2 were willful.

### COUNT 3
**Initiating Calls to Numbers on the Do Not Call Registry in Violation of
47 C.F.R. § 64.1200(c), (e)
(Against All Defendants)**

105.     Plaintiff adopts by reference paragraphs 1-104.

106.     In relevant part, 47 C.F.R. § 64.1200(c) prohibits telephone solicitations to residential telephone numbers on the National Do Not Call Registry and 47 C.F.R. § 64.1200(e) applies those requirements to wireless telephone numbers.  The relevant portion of subsection (c) provides:

No person or entity shall initiate any telephone solicitation to:

. . .

(2) A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government. Such do-not-call registrations must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator. Any person or entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable for violating this requirement if:

(i) It can demonstrate that the violation is the result of error and that as part of its routine business practice, it meets the following standards:

(A) Written procedures. It has established and implemented written procedures to comply with the national do-not-call rules;

18

(B) Training of personnel. It has trained its personnel, and any entity assisting in its compliance, in procedures established pursuant to the national do-not-call rules;

(C) Recording. It has maintained and recorded a list of telephone numbers that the seller may not contact;

(D) Accessing the national do-not-call database. It uses a process to prevent telephone solicitations to any telephone number on any list established pursuant to the do-not-call rules, employing a version of the national do-not-call registry obtained from the administrator of the registry no more than 31 days prior to the date any call is made, and maintains records documenting this process.

Note to paragraph (c)(2)(i)(D): The requirement in paragraph 64.1200(c)(2)(i)(D) for persons or entities to employ a version of the national do-not-call registry obtained from the administrator no more than 31 days prior to the date any call is made is effective January 1, 2005. Until January 1, 2005, persons or entities must continue to employ a version of the registry obtained from the administrator of the registry no more than three months prior to the date any call is made.

(E) Purchasing the national do-not-call database. It uses a process to ensure that it does not sell, rent, lease, purchase or use the national do-not-call database, or any part thereof, for any purpose except compliance with this section and any such state or federal law to prevent telephone solicitations to telephone numbers registered on the national database. It purchases access to the relevant do-not-call data from the administrator of the national database and does not participate in any arrangement to share the cost of accessing the national database, including any arrangement with telemarketers who may not divide the costs to access the national database among various client sellers; or

(ii) It has obtained the subscriber's prior express invitation or permission. Such permission must be evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed; or

(iii) The telemarketer making the call has a personal relationship with the recipient of the call.

107.    In relevant part, 47 C.F.R. § 64.1200(e) provides that wireless numbers can be placed on the National Do Not Call Registry:

(e) The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991."

108.　In relevant part, the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991," which is available at https://docs.fcc.gov/public/attachments/FCC-03-153A1.pdf, explains that allowing wireless numbers on the Do Not Call Registry furthers the goal of protecting subscribers from unwanted telephone calls :

> We conclude that the national database should allow for the registration of wireless telephone numbers, and that such action will better further the objectives of the TCPA and the Do-Not-Call Act. In so doing, we agree with the FTC and several commenters that wireless subscribers should not be excluded from the protections of the TCPA, particularly the option to register on a national-do-not-call list. [citation omitted] Congress has indicated its intent to provide significant protections under the TCPA to wireless users. [citation omitted] Allowing wireless subscribers to register on a national do-not-call list furthers the objectives of the TCPA, including protection for wireless subscribers from unwanted telephone solicitations for which they are charged.

109.　Defendants have violated 47 C.F.R. § 64.1200(c) and (e) by initiating telephone solicitations to Virginia residents on the National Do Not Call Registry.

110.　On information and belief, Defendants' telephone solicitations to Virginia residents on the National Do Not Call Registry were not the result of error, for Defendants

- had no written procedures to comply with National Do Not Call Registry rules;

- had no process to prevent telephone solicitations to numbers on the National Do Not Call Registry;

- did not train personnel or employees in procedures established pursuant to the national-do-not call rules; and

- did not access the National Do Not Call Registry to prevent unwanted calls to those on the registry.

20

111.     Defendants' telephone solicitations to Virginia residents on the National Do Not Call Registry were not made with subscribers' prior express invitation or permission.

112.     Defendants did not have personal relationships with those they called: Defendants were not calling their family members, friends, or acquaintances; they were calling strangers to solicit business.

113.     Defendants have willfully and knowingly engaged in a pattern or practice of making telephone calls or other transmissions in violation of 47 C.F.R. § 64.1200(c) and (e).

114.     Defendants' ongoing and serial calls constitute a continuing violation of 47 C.F.R. § 64.1200(c) and (e) because each call is a related discrete act that independently violates the regulation.

## <u>COUNT 4</u>
### Initiating Calls to Numbers on the Do Not Call Registry in Violation of Virginia Code § 59.1-514(B)
### (Against All Defendants)

115.     Plaintiff adopts by reference paragraphs 1-114.

116.     In relevant part, Virginia Code § 59.1-514 provides:

B. No telephone solicitor shall initiate, or cause to be initiated, a telephone solicitation call to a telephone number on the National Do Not Call Registry maintained by the federal government pursuant to the Telemarketing Sales Rule, 16 C.F.R. Part 310, and 47 C.F.R. § 64.1200.

C. It shall be an affirmative defense in any action brought under § 59.1-515 or 59.1-517 for a violation of this section that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitation calls in violation of this section, including using in accordance with applicable federal regulations a version of the National Do Not Call Registry obtained from the administrator of the registry no more than 31 days prior to the date any telephone solicitation call is made.

D. For purposes of this section, "telephone solicitation call" shall not include a telephone call made to any person: (i) with that person's prior express invitation or permission as evidenced by a signed, written agreement stating that the person agrees to be contacted by or on behalf of a specific party and including the telephone number to which the call may be placed, (ii) with whom the person on whose behalf the telephone call is made has an established business relationship, or (iii) with whom the telephone solicitor making the telephone call has a personal relationship. The exemption for an established business relationship or a personal relationship shall not apply when the person called previously has stated that he does not wish to receive telephone solicitation calls as provided in subsection A.

117.    Virginia Code § 59.1-510 defines "telephone solicitor" as "any person who makes, or causes another person to make, a telephone solicitation."

118.    Virginia Code § 59.1-510 defines "telephone solicitation call" as "any telephone call made to any natural person's residence in the Commonwealth, or to any wireless telephone with a Virginia area code, for the purpose of offering or advertising any property, goods or services for sale, lease, license or investment, including offering or advertising an extension of credit."

119.    Virginia Code § 59.1-510 defines "established business relationship" as

a relationship between the called person and the person on whose behalf the telephone solicitation call is being made based on: (i) the called person's purchase from, or transaction with, the person on whose behalf the telephone solicitation call is being made within the 18 months immediately preceding the date of the call or (ii) the called person's inquiry or application regarding any property, good, or service offered by the person on whose behalf the telephone solicitation call is being made within the three months immediately preceding the date of the call.

120.    Virginia Code § 59.1-510 defines "personal relationship" as "the relationship between a telephone solicitor making a telephone solicitation call and any family member, friend, or acquaintance of that telephone solicitor."

121.    Defendants have violated Virginia Code § 59.1-514 by initiating hundreds of telephone solicitations to wireless telephones with a Virginia area code that are on the National Do Not Call Registry.

122.    Defendants' telephone solicitations were for the purpose of offering or advertising Defendants' vehicle sales services.

123.    On information and belief, Defendants have not established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitation calls to wireless telephones with a Virginia area code on the National Do Not Call Registry, because Defendants

- had no written procedures to comply with national Do Not Call rules;

- had no process to prevent telephone solicitations to numbers on the National Do Not Call Registry;

- did not train personnel or employees in procedures established pursuant to the national-do-not call rules; and

- did not use an up-to-date version (or any version) of the National Do Not Call Registry to prevent unwanted calls to those on the registry.

124.    Defendants had no prior signed, written agreement with the called persons granting Defendants express permission or invitation to call those persons.  Instead, Defendants solicited those with Virginia area codes who had posted online advertisements with other businesses or on online platforms unrelated to Defendants, such as Craigslist, Autotrader, or Cars.com.

125.    Defendants did not have an established business relationship with the called persons.  Those called had not purchased Defendants' vehicle sales or buying services or transacted business with Defendants in the 18 months preceding the calls.  And those called had had not inquired or applied regarding Defendants' online vehicle sales services in the three months preceding the calls – those called had sought out and used the services of other businesses or online platforms.

23

126.     Defendants did not have personal relationships with those they called: Defendants were not calling their family members, friends, or acquaintances; they were calling strangers to solicit business.

127.     Defendants' acts or practices in violation of Virginia Code § 59.1-514(B) were willful.

## COUNT 5
### Failing to Disclose Seller's Identity or to Allow Recipients to Opt-Out in Violation of 47 C.F.R. § 64.1200(b)(1)
### (Against All Defendants)

128.     Plaintiff adopts by reference paragraphs 1-127.

129.     47 C.F.R. § 64.1200(b) requires prerecorded messages to disclose certain information and allow recipients to opt out of future calls:

(b) All artificial or prerecorded voice telephone messages shall:

(1) At the beginning of the message, state clearly the identity of the business, individual, or other entity that is responsible for initiating the call. If a business is responsible for initiating the call, the name under which the entity is registered to conduct business with the State Corporation Commission (or comparable regulatory authority) must be stated;

(2) During or after the message, state clearly the telephone number (other than that of the autodialer or prerecorded message player that placed the call) of such business, other entity, or individual. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges. For telemarketing messages to residential telephone subscribers, such telephone number must permit any individual to make a do-not-call request during regular business hours for the duration of the telemarketing campaign; and

Case 7:19-cv-00463-EKD   Document 1   Filed 06/24/19   Page 24 of 37   Pageid#: 24

(3) In every case where the artificial or prerecorded voice telephone message includes or introduces an advertisement or constitutes telemarketing and is delivered to a residential telephone line or any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii), provide an automated, interactive voice- and/or key press-activated opt-out mechanism for the called person to make a do-not call request, including brief explanatory instructions on how to use such mechanism, within two (2) seconds of providing the identification information required in paragraph (b)(1) of this section. When the called person elects to opt out using such mechanism, the mechanism, must automatically record the called person's number to the seller's do-not-call list and immediately terminate the call. When the artificial or prerecorded voice telephone message is left on an answering machine or a voice mail service, such message must also provide a toll free number that enables the called person to call back at a later time and connect directly to the automated, interactive voice- and/or key press-activated optout mechanism and automatically record the called person's number to the seller's do-not-call list.

130. The reference in 47 C.F.R. § 64.1200 subsection (b)(3) above to "telephone numbers described in paragraphs (a)(1)(i) through iii" of the regulation includes wireless or cellular telephone numbers, because subdivision (a)(1)(iii) includes "number[s] assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call."

131. Defendants make outbound telemarketing calls using prerecorded messages.

132. As shown in the voicemail message from paragraph 21 above, Defendants' prerecorded messages on outbound telephone calls violate 47 C.F.R. § 64.1200(b)(1) by failing to disclose the business's or seller's identity. Instead, they disclose only the pseudonym of the individual leaving the message – "my name is Peyton" –who discusses what "we can do to help you," without mentioning Defendants' identity.



133.     Defendants are responsible for initiating these calls: they are made by Defendants' owner, managers, or employees, on Defendants' equipment, at Defendants' direction, using content Defendants drafted.

134.     In addition, in violation of 47 C.F.R. § 64.1200(b)(3), Defendants' prerecorded telemarketing calls do not provide "an automated, interactive voice- and/or key press-activated opt-out mechanism for the called person to make a do-not call request."  They merely leave a number for the called person to call back.

135.     When Defendants leave prerecorded voice telephone messages on an answering machine or a voicemail service, Defendants do not leave a toll free number that enables the called person to call back at a later time and connect directly to the automated, interactive voice- and/or key press-activated opt-out mechanism and automatically record the called person's number to the seller's Do Not Call list.  Instead, in violation of 47 C.F.R. § 64.1200(b)(3), the

number Defendants provide connects to live operators, which does not provide the caller the option to use an automated system to opt-out of future calls or to be added to the seller's Do Not Call list.

136.    Defendants have willfully and knowingly engaged in a pattern or practice of making telephone calls or other transmissions in violation of 47 C.F.R. § 64.1200(b).

137.    Defendants' ongoing and serial calls constitute a continuing violation of 47 C.F.R. § 64.1200(b) because each call is a related discrete act that independently violates the statute.

## COUNT 6
### Failing to Disclose Seller's Identify in Violation of
### Virginia Code § 59.1-512
### (Against All Defendants)

138.    Plaintiff adopts by reference paragraphs 1-137.

139.    Virginia Code § 59.1-512 requires telephone solicitors to identify the person on whose behalf a call is made: "A telephone solicitor who makes a telephone solicitation call shall identify himself by his first and last names and the name of the person on whose behalf the telephone solicitation call is being made promptly upon making contact."

140.    Defendants' telemarketing calls violate Virginia Code § 59.1-512 in two ways: (1) they do not identify the last names of the solicitor making the call (or leaving the prerecorded message); and (2) they do not identify the person on whose behalf the telephone solicitation is being made, e.g., Defendants' companies.

141.    Defendants' acts or practices in violation of Virginia Code § 59.1-512 were willful.

## COUNT 7
### Failing to Disclose Full Terms of Refund Policy in Violation of 16 C.F.R. § 310.3(a)(1)(iii)
### (Against All Defendants)

142.     Plaintiff adopts by reference paragraphs 1-141.

143.     In relevant part, 16 C.F.R. § 310.3(a)(1) requires clear and conspicuous

disclosures of all material terms of a refund policy:

> (a) Prohibited deceptive telemarketing acts or practices. It is a deceptive
> telemarketing act or practice and a violation of this Rule for any seller or
> telemarketer to engage in the following conduct:
>
> (1)Before a customer consents to pay for goods or services offered, failing
> to disclose truthfully, in a clear and conspicuous manner, the following material
> information:
>
> . . .
>
> (iii)If the seller has a policy of not making refunds, cancellations,
> exchanges, or repurchases, a statement informing the customer that this is the
> seller's policy; or, if the seller or telemarketer makes a representation about a
> refund, cancellation, exchange, or repurchase policy, a statement of all material
> terms and conditions of such policy . . . .

144.     Defendants had a refund policy, but failed to disclose in a clear and conspicuous

manner all material terms and conditions of that refund policy prior to sale.

145.     Specifically, Defendants' sales were often completed over the telephone, and

these telephonic sales did always not disclose in a clear and conspicuous manner prior to sale the

following material terms and conditions:

- A customer must provide a picture of their vehicle within 14 days of purchase;

- A customer must provide the buyer's last name, sale date, and Vehicle Identification Number;

- A customer must request the refund (not just complete the vehicle sale) within 45 days of purchase;

- Defendants' may not provide a refund even if customers meet all of Defendants' terms and conditions.

28

146.     Defendants' ongoing and repeated failure to fully disclose the material terms of their refund policy constitutes a continuing violation of 16 C.F.R. § 310.3(a) because each such act is a related discrete act that independently violates the regulation.

147.     Defendants have willfully and knowingly engaged in a pattern or practice of failing to fully disclose their refund policies' material terms in violation of 16 C.F.R. § 310.3(a).

## COUNT 8
**Deceptive Sales Practices in Violation of Virginia Code § 59.1-200**
**(Against All Defendants)**

148.     Plaintiff adopts by reference paragraphs 1-147.

149.     Virginia Code § 59.1-197 provides that the Virginia Consumer Protection Act is to be applied as remedial legislation to promote fair and ethical standards of dealings between suppliers and the consuming public.

150.     Virginia Code § 59.1-198 defines "consumer transaction" to mean "[t]he advertisement, sale, lease, license or offering for sale, lease or license, of goods or services to be used primarily for personal, family or household purposes."

151.     Virginia Code § 59.1-198 defines "supplier" to mean "a seller who advertises, solicits or engages in consumer transactions."

152.     In part, Virginia Code § 59.1-200 provides

A. The following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful:
· · ·
    5. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;
· · ·
    8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised. In any action brought under this subdivision, the refusal by any person, or any employee, agent, or servant thereof, to sell any goods or services advertised or offered for sale at the price or upon the terms advertised or offered, shall be prima facie evidence of a violation of this subdivision. This paragraph shall not apply when it is clearly

29

and conspicuously stated in the advertisement or offer by which such goods or services are advertised or offered for sale, that the supplier or offeror has a limited quantity or amount of such goods or services for sale, and the supplier or offeror at the time of such advertisement or offer did in fact have or reasonably expected to have at least such quantity or amount for sale.

. . .

14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

153. Defendants engage in "consumer transactions" by advertising, offering for sale, and selling services to help or assist individuals in selling used vehicles for personal, family, or household purposes.

154. Defendants are suppliers because they advertised, solicited, and engaged in transactions in Virginia with consumers around the country to assist consumers in selling their household or personal vehicles. Specifically, Adventis, Inc. and Bryant Cass advertised, offered for sale, and sold these services from around 2010 to around June 2017, and Skyline Metrics, LLC and Bryant Cass advertised, offered for sale, and sold these services from around June 2017 to the present.

155. Defendants violated Virginia Code § 59.1-200 in four ways.

156. First, Defendants misrepresented the existence and number of vehicle buyers Defendants had as clients, especially local vehicle buyers.

157. Defendants' outgoing voicemails claimed to have "clients who are shopping for a vehicle" like the one the seller listed, regardless of whether Defendants actually had such clients.

158. Defendants' website, scripts, emails, and direct mail claimed to have "targeted customers" looking to purchase a vehicle like the one the vehicle's seller listed, irrespective of whether Defendants actually had such customers.

159. Defendants' website, scripts, emails, and direct mail claimed or implied that Defendants had been engaged by hundreds of buyers a day or thousands of buyers a week to help

30

search for vehicles to purchase, when, in fact, Defendants were engaged principally if not exclusively by vehicle sellers, not buyers.

160. Defendants' website, scripts, emails, and direct mail claimed that Defendants would begin talking to buyers about a seller's vehicle immediately after purchase of Defendants' services, when, in fact, Defendants did not do so.

161. Defendants' false claims and misrepresentations about the numbers of vehicle buyers, including the number of buyers in the seller's area and the number of buyers actively looking for vehicles like the sellers' vehicle, violated Virginia Code § 59.1-200(A)(5) and (14).

162. Second, Defendants' website, scripts, emails, direct mail, and sales receipts mispresented its "money back guarantee" and its refund policies and practices.

163. Defendants added procedural hurdles and undisclosed terms to block consumers from getting refunds.

164. Defendants repeatedly failed to issue refunds to qualified consumers.

165. Defendants' false claims and misrepresentations about refunds violated Virginia Code § 59.1-200(A)(5), (8), and (14).

166. Third, Defendants misrepresented that they would pre-screen buyers, when, in fact, Defendants conducted no such pre-screening.

167. Defendants' false claims and misrepresentations about pre-screening violated Virginia Code § 59.1-200(A) (5), (8), and (14).

168. Fourth, Defendants misrepresented that they would run targeted advertising on Facebook and social media for all customers, when, in fact, they did not run targeted advertising for all their customers, and, at times, stopped running such advertising altogether.

169. Defendants' false claims and misrepresentations about targeted advertising

31

violated Virginia Code § 59.1-200(A) (5), (8), and (14).

170.     Defendants have willfully engaged in these acts and practices in violation of the Virginia Consumer Protection Act.

171.     Individual consumers have suffered losses as a result of these Virginia Consumer Protection Act violations.

## COUNT 9
### Failing to Disclose and Honor Right to Cancel Telephonic Home Sales in Violation of Virginia Code §§ 59.1-21.3, 59.1-21.4, 59.1-21.5, and 59.1-200(A)(19)
### (Against All Defendants)

172.     Plaintiff adopts by reference paragraphs 1-171.

173.     Virginia Code § 59.1-200(A)(19) makes it a prohibited act or practice under the Virginia Consumer Protection Act to violate any provision of the Virginia Home Solicitation Sales Act (Sales Act).

174.     Virginia Code § 59.1-21.3 provides that the buyer has until midnight of the third business day to cancel a home solicitation sale.

175.     Virginia Code § 59.1-21.2 provides that "[h]ome solicitation sales," include residential telephone solicitations and purchases:

A. 'Home solicitation sale' means:

1. A consumer sale or lease of goods or services in which the seller or a person acting for him engages (i) in a personal solicitation of the sale or lease or (ii) in a solicitation of the sale or lease by telephonic or other electronic means at any residence other than that of the seller; and
2. The buyer's agreement or offer to purchase or lease is there given to the seller or a person acting for him.

B.      1. 'Home solicitation sale' shall not mean a consumer sale or lease of farm equipment.

2. It does not include cash sales of less than twenty-five dollars, a sale or lease made pursuant to a preexisting revolving charge account, or a sale or lease made pursuant to prior negotiations between the parties.

176.     Virginia Code § 59.1-21.4(1) generally provides that a seller must present to the

buyer a "fully completed receipt" (or a written agreement) that includes a statement of the buyer's rights to cancel under a "conspicuous caption" that is "in bold face type of a minimum size of ten points" that reads "BUYER'S RIGHT TO CANCEL."  It also requires the seller to include a separate "Notice of Cancellation" form for the buyer to make the cancellation and describes word-for-word the content of that form.

177.    Virginia Code § 59.1-21.4(3) provides that until a seller complies with the Sales Act's notice requirements, the buyer may cancel the sale anytime by "notifying the seller in any manner and by any means of [the buyer's] intention to cancel."

178.    Virginia Code § 59.1-21.5(1) requires sellers to tender payments made within 10 days of cancellation: "[e]xcept as provided in this section, within ten days after a home solicitation sale has been canceled or an offer to purchase revoked the seller must tender to the buyer any payments made by the buyer and any note or other evidence of indebtedness."  The two exceptions in the section refer to goods and not services, so are inapplicable here.

179.    Defendants engaged in home solicitation sales.

180.    Defendants solicited vehicle-selling business by telephone or other electronic means, and they did so by pitching their services to the cellular telephone numbers of Virginia residents, many of whom were at home ("at a residence other than the seller's") when Defendants called and when they purchased Defendants' services.

181.    As the FCC has observed, telephone calls to cellular numbers invariably lead to calls to residences, since many consumers no longer have residential land lines or use their cellular number as their primary residential number.  *See*, *supra*, FCC 03-153, "Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991" at pp. 25-26, *available at* https://docs.fcc.gov/public/attachments/FCC-03-153A1.pdf.

33

182.    Defendants violated the Sales Act in three ways.

183.    Defendants violated Virginia Code § 59.1-21.4(1) by failing to disclose Virginia consumers' right to cancel in their sales receipt for purchases that were solicited, negotiated, and executed at Virginia consumers' residences.

184.    Defendants violated Virginia Code § 59.1-21.4(1) by failing to provide Virginia consumers a separate notice of cancellation form for those home sales.

185.    Because Defendants never properly notified consumers of their right to cancel, Virginia consumers had the right to cancel anytime.

186.    On information and belief, Defendants violated Virginia Code §§ 59.1-21.5(1) and 59.1-21.4(3) by failing to tender Virginia buyers' payments made within 10 days of consumers' refund requests, which notified Defendants of consumers' intention to cancel.

187.    Individual consumers have suffered losses as a result of these Virginia Consumer Protection Act violations.

188.    Defendants have willfully engaged in these acts and practices in violation of the Virginia Consumer Protection Act.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff, the Commonwealth of Virginia, prays that this Court grant judgment against Defendants for the violations of telemarketing and consumer protection laws alleged here and prays this Court grant the following relief.

*Injunctive Relief*

A.  As authorized by 47 USC § 227(g)(1-2), 15 U.S.C. § 6103(a), and Virginia Code §§ 59.1-517(A), 59.1-518.4, and 59.1-203(A), preliminarily and permanently enjoin Defendants and their officers, employees, agents, successors, and assigns from violating the Telephone

34

Consumer Protection Act, the FCC's Restrictions on Telemarketing, Telephone Solicitation, and Facsimile Advertising, the FTC's Telemarketing Sales Rule, the Virginia Telephone Privacy Protection Act, and the Virginia Automatic Dialing-Announcing Devices Act, including enjoining them from making unsolicited prerecorded or autodialed calls in violation of 47 U.S.C. § 227(b)(1)(A)(iii) and Virginia Code § 59.1-518.2, from initiating calls to numbers on the National Do Not Call Registry in violation of 47 C.F.R. § 64.1200(c) and Virginia Code § 59.1-514(B), from failing to make required disclosures to call recipients and failing to allow call recipients to request not to receive further solicitation calls in violation of 47 C.F.R. § 64.1200(b), 16 C.F.R. § 310.4(d), and Virginia Code § 59.1-512, and from failing to honor Do Not Call requests in violation of 16 C.F.R. § 310.4(b)(ii) and Virginia Code § 59.1-514(A).

B.  As authorized by Virginia Code §§ 59.1-203 and 59.1-21.7:1, preliminarily and permanently enjoin Defendants and their officers, employees, agents, and successors from violating the Virginia Consumer Protection Act and the Virginia Home Solicitation Sales Act.

*Damages*

C.  As authorized by Virginia Code § 59.1-517(A), award Plaintiff statutory damages for violations of the Virginia Telephone Privacy Protection Act in the amount of $500 per violation.

D.  As authorized by 47 U.S.C. § 227(g)(1), award Plaintiff actual or statutory damages for violations of the Telephone Consumer Protection Act and the Federal Communication Commission's Restrictions on Telemarketing and Telephone Solicitations to recover Virginia residents' actual monetary losses or $500 in damages per violation, or treble those amounts for willful and knowing violations.

E.  As authorized by 15 U.S.C. § 6103, award Plaintiff damages or other compensation on behalf of Virginia residents for violations of the Telemarketing Sales Rule.

*Restitution*

F.   Award to the Plaintiff all sums necessary to restore to any consumers the money or property unlawfully acquired from them by Defendants as authorized by the following laws: (1) Virginia Code § 59.1-205 for the Virginia Consumer Protection Act, Virginia Automatic Dialing Devices Act, and Virginia Home Solicitation Act violations and (2) 15 U.S.C. § 6103 for the Telemarketing Sales Rule violations.

*Civil Penalties*

G.   Award to the Plaintiff civil penalties as authorized by the following laws: (1) under Virginia Code § 59.1-206(A), award up to $2,500 per willful violation of the Virginia Automatic Dialing Devices Act, the Virginia Consumer Protection Act, and the Virginia Home Solicitation Sales Act; and (2) under Virginia Code § 59.1-517, award up to $1,000 per willful violation of the Virginia Telephone Privacy Protection Act.

*Attorneys' Fees, Costs, and Expenses*

H.   As authorized by Virginia Code §§ 59.1-206(C) and 59.1-517(C), award to the Plaintiff its attorneys' fees for actions brought under the Virginia Consumer Protection Act (including the Virginia Automatic Dialing Devices Act and the Virginia Home Solicitation Sales Act) and actions brought under the Virginia Telephone Privacy Protection Act.

I.   As authorized by Virginia Code §§ 59.1-206(C) and 59.1-517(C), award Plaintiff's costs and reasonable expenses incurred in investigating and preparing this case, though the Consumer Protection Act caps these costs and reasonable expenses at $1,000 per violation.

36

*Other and Further Relief*

J.   Grant such other and further relief as the Court deems equitable and proper.

<u>      /s/      </u>
**Geoffrey Laurence Ward**
Virginia Bar Number: 89818
Attorney for Plaintiff
Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, Virginia 23219
Telephone: (804) 371-0817
Fax: (804) 786-2071
E-mail:  gward@oag.state.va.us

Mark R. Herring
Attorney General

Cynthia E. Hudson
Chief Deputy Attorney General

Samuel T. Towell
Deputy Attorney General

Richard S. Schweiker, Jr.
Senior Assistant Attorney General and Chief
Consumer Protection Section